UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANNIE HUMPHRIES,

                Petitioner,                Case No. 2:18-cv-11406
                                                     Hon. Nancy G. Edmunds

v.

SHAWN BREWER,

                Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING A CERTIFICATE OF APPEALABILITY, AND (3) GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

Annie Humphries, ("Petitioner"), a Michigan prisoner, filed this action under 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in the Wayne Circuit Court of unarmed robbery, MICH. COMP. LAWS § 750.530, and first-degree home invasion, MICH. COMP. LAWS § 750.110a(2). Petitioner was sentenced to 6 to 20 years for the robbery conviction and 10 to 25 years for the home invasion conviction.

The petition raises six claims: (1) the trial court erred in allowing admission of a second recording of a surveillance video, (2) the trial court erred in scoring the sentencing guidelines, (3) the prosecutor and police erroneously failed to preserve the original surveillance video, (4) the trial court erred in allowing lay opinion testimony, (5) Petitioner was denied the effective assistance of trial counsel, and (6) the trial court lacked jurisdiction to try Petitioner. The Court will deny the petition because Petitioner's claims are without merit. The Court will also deny Petitioner a certificate of appealability, but it will grant permission to appeal in forma pauperis.

1

# I. Background

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). See *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009):

> Defendant's convictions arise out of her role in the robbery of 81-year-old Robert Jones inside his Highland Park apartment on January 6, 2013. At trial, the prosecution's theory was (1) that defendant aided and abetted an unknown man who entered the victim's apartment, demanded money, and took $85, based on her knowledge that Jones left his apartment door unlocked so that others could enter to assist him, and (2) that defendant decided to rob the victim after he refused to loan her money.
>
> According to Jones's testimony, defendant, who lived in Jones's apartment complex, entered his apartment at approximately 6:00 or 7:00 p.m. by simply opening the door, which she usually did because she was a good friend of Jones's girlfriend, who was Jones's caretaker. Jones left the door open for his girlfriend because he did not have an extra key for her. Defendant said to Jones, "Bob, let me have $2.00," and Jones replied that he did not have $2. She repeated her request, and Jones again told her that he did not have any money. Defendant then left, closing the door behind her.
>
> A few seconds after defendant left Jones's apartment, the door opened again and a man walked in. Jones did not see what the man looked like, as his face was covered with the arm of a lighter-colored coat or jacket. The man said, "Bob, give me all of your money." Because the man called Jones by his name, Jones thought that he might know the man. Jones initially thought the man was joking, but he then saw that the man had a knife in his left hand. Jones, who was in a wheelchair, became afraid and did not want the man to get behind him, so he kept moving to keep the man in front of him. Jones refused to give the man any money, but the man took $85 from Jones's pocket. Subsequently, Jones refused to accompany the man into the hallway. The man swung the knife at him; when Jones put up his arm to keep his face from being cut, the blade cut his right wrist. Jones then went downstairs, and a woman there encouraged him to call the police. Highland Park Police Officers Adam Lewis and Lisa Schultz responded to the call.
>
> After the incident, Detective Paul Thomas, the officer in charge, spoke with the apartment building manager, Ayana Nichols, and learned that surveillance footage was available from cameras placed in common areas in the apartment building. The surveillance footage was recorded on a computer system. After speaking with Nichols, Thomas did not believe that he would be able to obtain a copy of the original footage directly from the surveillance system. Thomas also learned that the footage would be saved for only six days before the system would

automatically record over the old footage. In order to preserve the footage, Thomas's partner, Detective Terrell Shaw, held his tablet up to the surveillance system's video screen and used the tablet to record the surveillance video; the officers believed, given the time constraints, that this was the best way to preserve the evidence.[2]

At trial, defendant moved in limine to exclude the recording under the best evidence rule. The trial court denied defendant's motion in limine, and the prosecution presented the recording of the surveillance footage from the tablet. According to Thomas's testimony, he viewed the original version and the version recorded on the tablet, determining that they appeared to be the same; everything that he had seen on the original system was captured by Shaw's recording. He did not believe that anything on the recording had been altered, and he denied changing anything on the recording made by Shaw. The date and time on the original recording corresponded to the date and time of the offense. Nichols viewed the copy of the recording made on Shaw's tablet and believed that nothing had been altered from the original version; the only difference was that the date and timestamps were more visible on the original recording. Likewise, Nichols viewed the recording at trial and confirmed that it was the same footage captured by the surveillance system.

Thomas also testified regarding the events that transpired on the surveillance video.[3] He indicated that the recording showed defendant letting a person into the building, walking and getting on an elevator with that person, entering and exiting her apartment with the same person, and then getting on the elevator again to go to another floor. Based on the video, Thomas testified that he believed that defendant was associated with the other person and that defendant did not knock before entering Jones's apartment. Thomas testified that Nichols told him that she was only able to identify defendant in the video, not the man who was with defendant. Thomas indicated that the recording did not show the events that occurred inside Jones's apartment, but the recording showed the unidentified man leaving the building on his own, without defendant.

Nichols also provided testimony regarding the activities depicted on the surveillance video, narrating the events as the jury viewed the recording and identifying particular aspects of the building and its layout. She explained that the recording initially showed the building's parking lot and a side stairwell. Next, the recording showed defendant letting someone into the building through the side door and walking up the stairs behind the man. The video showed that the man exited the elevator at the same time that defendant got off and followed her into an apartment rather quickly; Nichols stated that they went into the apartment where defendant was living with her boyfriend's father. After staying in the apartment for a brief period, defendant and the man left the unit and entered the elevator on the fourth floor. The man got off somewhere between the fifth and seventh floors, while defendant rode up to the eighth floor, where Jones lived. When the man entered the elevator, he was wearing dark clothing, but when he exited, he was wearing a white

hooded shirt. He walked down the hallway in the direction of a stairwell, which anyone could enter without a key or swipe card. When defendant subsequently exited the elevator, she was carrying a bag with something in it. After checking the surveillance cameras picturing the elevators on all of the other floors, Nichols determined that defendant and the man were the only two people who entered that particular elevator. Nichols explained that the recording then showed defendant walking toward the end of the hallway, where Jones's apartment was located. Defendant entered Jones's apartment for about 15 to 20 seconds and then walked back out, looking back to her left as she exited. Nichols then testified that the recording showed a man in a white hooded jacket leaving Jones's apartment and exiting down a stairwell to a vehicle parked outside. Nichols indicated that there was video footage showing where defendant went after she entered the elevator for the second time, but that footage was not recorded on the tablet.

Lewis also testified regarding his conversation with Jones when Lewis arrived at the location following the incident:

> Q. What was the nature of the conversation you had in the lobby?
>
> A. Basically what had occurred. And he had stated that he believed that another resident at the location had kind of set him up to get money stolen from him while he was in his apartment.
>
> * * *
>
> Q. All right, now. Based on—without telling me what he said at this point—based on what he told you, did you determine that there were some persons that you wanted to try to find and speak to?
>
> A. That is correct.
>
> Q. And was one of those persons a female by the name of Annie Humphries?
>
> A. Yes.
>
> Q. Why was that, based on what Mr. Jones told you, that you wanted to speak to Ms. Humphries?
>
> A. Well, he had stated that—when I originally spoke with him—that Ms. Humphries had walked into his apartment unannounced, requested $2.00 to purchase some alcohol.
>
> He had stated that he informed Ms. Humphries that he did not have the $2.00.

> At that point he states that Ms. Humphries exited. And as soon as she had exited his apartment door, in came Suspect 1, the unidentified black male that basically had his face covered, and stated, knew him by name.
>
> Told Bob, "Give me your money, Bob. Give me your money."
>
> And he stated basically that he felt the two of them were involved in this together, Ms. Humphries and this unidentified suspect.
>
> Q. And that was the reason that you wanted to speak to Ms. Humphries?
>
> A. That's correct.

At sentencing, the defense only identified one factual issue in the [presentence investigation report (PSIR)], indicating that defendant had no recollection of the 1992 misdemeanor conviction of possession of counterfeit bank or municipal bills that was listed under her adult history. Although the prosecution indicated that it had no problem with the trial court striking the misdemeanor from the PSIR, the trial court decided not to strike the conviction because the misdemeanor did not affect defendant's sentencing guidelines. The court stated, "[W]e'll note on the record here that the defendant contests that she has this. And it's noted, duly noted for the record so that in the future she can challenge it if she gets information or proof that it's not her." Following this exchange, the trial court noted that it only received sentencing guidelines for the first-degree home invasion conviction, so it made a copy of the [sentencing information report (SIR)] for that conviction and created a second SIR for the unarmed robbery conviction. Defendant did not raise any objections to the trial court's scoring of the sentencing guidelines, including the gaps between her previous convictions, which she committed between 1992 and 2008.

---

[2] At trial, Nichols testified that she did not believe that copies could be made from the building's surveillance equipment because there was no way to plug in a cord to attach it to a computer or another recording device, and the surveillance system did not have a disc that could be removed. Nichols contacted the corporate office and the persons who installed the system, and she was advised that there was no way to make a direct copy of the recording. She testified that the manner in which Officer Terrell Shaw created a copy, i.e., by recording the surveillance footage with another device as the video played on the surveillance system, was the only known way to produce or save a copy of the recording. Thomas admitted during his trial testimony that he did not directly contact the company responsible

for maintaining the recording equipment to ask about obtaining a copy and acted in reliance on Nichols's statements regarding the availability of copies.

[3] It does not appear from the record that Thomas provided this testimony while the jury viewed the video.

*People v. Humphries*, 2015 WL 5442815, at *1-3 (Mich. Ct. App. Sep. 15, 2015).

Following sentencing, Petitioner was appointed appellate counsel who filed a claim of appeal. Appellate counsel filed a brief on appeal raising two claims:

> I. The court below erred by not allowing the defendant to review the entire surveillance video, by admitting the edited video at trial, and the prosecutor must produce the video on remand for defendant to review on appeal.
>
> II. Defendant is entitled to resentencing where the trial court used inaccurate information and offenses more than 10 years prior pursuant to MCL 777.50 at sentencing, and trial counsel was ineffective for failing to properly object.

Petitioner also filed a supplemental pro se brief on appeal that raised an additional three claims:

> I. Defendant was denied her right to due process and her right to present a defense in violation of her Sixth and Fourteenth Amendment rights as the police officers acted in bad faith by failure to preserve material exculpatory evidence from the video surveillance tape and by failure to investigate and subpoena the entire surveillance video tape.
>
> II. The trial judge reversibly erred by permitting witnesses to provide lay opinion and narrative testimony concerning the contents of the video surveillance tape which denied defendant due process of law and a fundamentally fair trial in violation of her Sixth and Fourteenth Amendment rights.
>
> III. Defendant was denied her state and federal rights to the effective assistance of counsel where defense counsel failed to object to hearsay testimony which prejudiced and denied defendant her due process rights to a fair trial. Defense counsel was also ineffective by failure to object to witnesses' lay opinion and narrative testimony concerning the contents of the video surveillance tape where the opinions intruded upon the jury's sole authority to interpret evidence.

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion. *Humphries*, 2015 WL 5442815, at *13. The appellate court remanded the case to the trial

court to correct errors in the pre-sentence investigation report and the sentencing information report. *Id*.

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising the same five claims. The Michigan Supreme Court denied the application by standard form order. *People v. Humphries*, 876 N.W.2d 562 (Mich. 2016) (Table).

Petitioner returned to the trial court and filed a document that raised what now forms her sixth habeas claim. The trial court treated the pleading as a motion for relief from judgment and denied it. Dkt. 9-16. Petitioner appealed this decision to both the Michigan Court of Appeals and the Michigan Supreme Court, but both courts denied relief. Dkts. 9-22; 9-23.

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413.

7

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (internal quotation omitted).

### III. Analysis

A. Admission of Second Recording of Surveillance Video

Petitioner first claims that the trial court erred in allowing the prosecutor to admit a recording made by a police officer on his tablet of the surveillance video from the apartment complex purporting to show Petitioner and the unknown male perpetrator in the victim's building. The officer was told that the surveillance video would be recorded over by the complex's computer system, so he used his tablet's camera to record the surveillance footage from a monitor. The Michigan Court of Appeals found that the video was properly admitted under state law:

> Here, because the original surveillance video was recorded on a system that was not capable of being copied or preserved, and the testimony shows that the tablet recording appeared to be the same as the original surveillance video, the tablet recording of the original video footage qualified as other evidence of the contents of the original, and the trial court did not abuse its discretion in admitting the tablet video under MRE 1004(2).
>
> To the extent that defendant challenges the authenticity of the recording shown to the jury, we also reject this argument. MRE 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to

> admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(b)(1) provides that authentication or identification can be proved by witness "[t]estimony that a matter is what it is claimed to be." The prosecutor offered the tablet recording as evidence of the contents of the original surveillance footage of the events surrounding the charged offense. The evidence that the police used a tablet device to record the original surveillance video, and the testimony of Nichols and Thomas that they viewed both versions and they appeared to be the same, was sufficient to authenticate the tablet recording as a copy of the original.

*Humphries*, 2015 WL 5442815, at *6.

Petitioner's claim that the video was erroneously admitted into evidence is not cognizable on habeas review. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Instead, a habeas court may only review whether a state court conviction runs afoul of the Constitution, laws, or treaties of the United States. *Id*. at 68. "Errors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2006). Typically, to show a due-process violation under AEDPA rooted in an evidentiary ruling, there must be a Supreme Court case establishing a due-process right with regard to that specific kind of evidence. *Collier v. Lafler*, 419 F. App'x 555, 558 (6th Cir. 2011). Since there is no Supreme Court case showing that a state violates a defendant's due process rights by allowing the admission of a video of another video into evidence at trial, this claim is not cognizable on habeas review.

B. Sentencing Guidelines

Petitioner next asserts that the trial court erred in scoring his sentencing guidelines. Specifically, Petitioner asserts that the trial court scored the prior offense variables by counting

offenses that were too old, and that it scored offense variable for the use of a weapon though there was no evidence that she possessed one admitted at trial.

With respect to the correctness of the guidelines score under state law, the issue is not cognizable. See *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007). Misapplications of state sentencing guidelines are "errors of state law" for which "habeas corpus relief does not lie." *Kissner v. Palmer*, 826 F.3d 898, 902 (6th Cir. 2016) (quoting *Estelle*, 502 U.S. at 67).

With respect to any claim that the scoring of the guidelines violated Petitioner's Sixth Amendment jury trial rights, the Michigan Court of Appeals found any error to be harmless:

> Although defendant does not expressly raise a constitutional challenge on *Apprendi/Alleyne* grounds to the trial court's scoring of OV 1 and OV 2, defendant's argument on appeal does contend that the trial court utilized facts not found beyond a reasonable doubt by the jury or admitted by defendant in order to score OV 1 and OV 2. Thus, to the extent that defendant's challenge to her sentences can be construed as an *Apprendi/Alleyne* claim, our review is for plain error affecting substantial rights because "defendant did not object to the scoring of the OVs at sentencing on *Apprendi/Alleyne* grounds." *Lockridge*, ___ Mich. at ___; slip op at 30.
>
> It is apparent that the trial court utilized facts that were not established by the jury's verdict or admitted by defendant in establishing scores for OV 1 and OV 2. And, therefore, a constitutional error in violation of the Sixth Amendment resulted, regardless of whether this error had a substantive effect on defendant's sentences. *Lockridge*, ___ Mich. at ___; slip op at 31 n. 30. Nevertheless, despite this constitutional error, defendant cannot demonstrate prejudice from the trial court's assessment of five points for OV 1 and OV 2 because a reduction of 10 points would not affect the appropriate guidelines range. See *id.* at 31 n. 30 ("[W]hether [an] error actually increases the floor of a defendant's minimum sentence range under the guidelines is only relevant to the question of whether the defendant has suffered any prejudice."), 32-33, 36; see also *Francisco*, 474 Mich. at 89 n. 8 ("Where a scoring error does not alter the appropriate guidelines range, resentencing is not required."). Defendant received a total OV score of 20 points, placing her in OV Level II (10 to 24 points) on the applicable sentencing grids. MCL 777.63 (home invasion); MCL 777.64 (unarmed robbery). Even with a 10-point reduction, defendant's OV score would remain in OV Level II; accordingly, defendant is not entitled to resentencing.

*Humphries*, 2015 WL 5442815, at *11-12.

The Court of Appeals found that the scoring of two offense variables violated Petitioner's Sixth Amendment rights, but it found relief was nevertheless not warranted because even if the erroneously scored variables were excluded, the applicable guideline range would not have been different.

The state appellate court correctly found that the scoring of the mandatory sentencing guidelines based on facts not admitted by Petitioner nor found beyond a reasonable doubt by the jury violated Petitioner's Amendment rights. A Michigan trial court's use of judge-found facts to score mandatory sentencing guidelines that resulted in an increase of a defendant's minimum sentence violates the Sixth Amendment. *See Robinson v. Woods*, 901 F.3d 710 (6th Cir. 2018). Nevertheless, under clearly established Supreme Court law, such errors are subject to harmless error analysis. *See United States v. Booker*, 543 U.S. 220, 268 (2005); *Washington v. Recuenco*, 548 U.S. 212, 222 (2006). For purposes of federal habeas review, a constitutional error is considered harmless if it did not have a "substantial and injurious effect or influence" in determining the outcome of the proceeding. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411 (6th Cir. 2009) (ruling that *Brecht* is "always the test" in the Sixth Circuit).

Here, the trial court did not base Petitioner sentence on facts not found beyond a reasonable doubt by the jury. The trial court did not articulate any specific reasons for its sentence, other than to state in response to Petitioner's claimed innocence that, "I have to impose a sentence according to the jury's findings." Dkt. 9-11, at 10. The controlling 10 to 20 year sentence for the first-degree home invasion conviction fell within the 36 to 142 month minimum term range called for by the guideline score. Id., at 7. As the Michigan Court of Appeals found, even if the guidelines been scored as Petitioner argues, the minimum recommended range would have been the same. There

is no indication in the record, therefore, that Petitioner's sentence would have been any different had the guidelines been scored in compliance with the Sixth Amendment. Accordingly, any error was harmless.

## C. Failure to Preserve Original Surveillance Video

Petitioner next claims that the police failed to produce the original surveillance video and they instead allowed it to be destroyed in bad faith. This claim was not preserved at trial and was raised by Petitioner in his pro se supplemental brief in the Michigan Court of Appeals. The state court noted that the claim was unpreserved, but it also found that it did not merit relief:

> There is no indication in the record that the police suppressed, destroyed, or lost any evidence. On the contrary, the record shows that the police acted to preserve evidence after discovering that the apartment building's video surveillance system did not have a removable disk or a connection whereby the original recording could be transferred to another recording device, and that the system would automatically record over the original recording after six days. A copy of that recording was provided to the defense.
>
> Further, there is no record support for defendant's argument that portions of the original recording were omitted from the tablet copy. Although the date and timestamps did not clearly appear on the tablet copy, both Nichols and Thomas testified that they viewed both versions and that they appeared to be the same, and Thomas testified that the tablet recording contained the entirety of the original with respect to the events surrounding the charged offense. Defendant has not identified any evidence indicating that there were portions of the original recording that depicted events related to the charged offense that were not included in the tablet recording; in support of her position, she only provides a description in her Standard 4 brief of her movements on the day of the incident, which is not supported by the evidence in the record, and notes Nichols's testimony confirming that video surveillance of defendant leaving the elevator for the second time was not included in the tablet recording. Contrary to defendant's characterization of the officers' purported failure to preserve portions of the surveillance video, we find no indication of intentional suppression of evidence or bad faith in the record. See *Youngblood*, 488 U.S. at 58; see also *People v. Johnson*, 197 Mich. App. 362, 365 (1992). Accordingly, defendant has failed to establish that the prosecution withheld exculpatory evidence, or that the police failed to preserve potentially exculpatory evidence in bad faith.

*Humphries*, 2015 WL 5442815, at *13.

Under clearly established Supreme Court law, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Bagley*, 473 U.S. 667, 675 (1985). "There are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. at 281 (quoting *Bagley*, 473 U.S. at 682); see also *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Bagley*, 473 U.S. at 682.

With respect to the destruction of evidence, clearly established Supreme Court law creates a different test "when [courts] deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). "[U]nless a criminal defendant can show bad faith on the part of the [prosecution], failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id*. at 58. To prevail on his claim, the petitioner must show: (1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other means. *Youngblood*, 488 U.S. at 57.

"The presence or absence of bad faith by the [prosecution] for purposes of the Due Process Clause must necessarily turn on the [prosecution's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.*, 488 U.S. at 57. When the government is negligent, or even grossly negligent, in failing to preserve potentially exculpatory evidence, bad faith is not established. *Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002).

The Michigan Court of Appeals did not unreasonably apply these standards in denying Petitioner relief. As for the *Brady* claim, Petitioner has not established that the actions as depicted on the police recording differ in any real way from what would have been seen on the original recording. In other words, she does not establish that the original recording contained any exculpatory information that was lost. Petitioner speculates that the original recording might have depicted her leaving the complex before the crime, but she does not support that speculation with anything of substance. In any event, such a time-line would be contradicted by the victim's testimony. Jones testified that the unknown male assailant entered his apartment seconds after Petitioner left.

As to the destruction of evidence claim, Petitioner has completely failed to demonstrate that the police acted in bad faith in failing to secure the original recording. Indeed, it appears the opposite is true. By using the tablet to make a recording of the original video as it was played was the officers' way of preserving the evidence. Detective Thomas explained that he asked the building manager to obtain an original copy of the recording, but the computer system could not produce a copy. Dkt. 9-9, at 28-29, 70. He was told that the computer would overwrite the video in six days. Id., at 30, 70. Thomas testified that the original recording and the tablet recording "appeared the same." Id. at 29-30.

In light of the record, the Michigan Court of Appeals did not unreasonably deny relief with respect to this claim.

D. Admission of Testimony Regarding Video

Petitioner next asserts that the trial court erred in allowing the police officer and apartment manager to testify as to their opinions as to what the surveillance video showed. Both described the layout of the building, and the apartment manager commented on when and where Petitioner appeared on the video. The Michigan Court of Appeals found that the testimony was properly admitted under Michigan evidentiary law:

> First, the witnesses' commentary regarding the layout of the building and locations depicted in the video was based on their perceptions of the video and their previous knowledge of the apartment building, which was helpful for the jury to understand events depicted in the video. In this case, Nichols and Thomas both had personal knowledge of the layout, as Nichols was familiar with the building because she was the building manager, and Thomas was familiar with the building due to his investigation of the offense. Additionally, it is evident that Nichols and Thomas both had personal knowledge of the surveillance footage on the recording. MRE 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Both were in a better position than the jury to identify the locations of events depicted in the video. This was helpful to the jury because of the multiple views of different floors of the building. As such, their testimony was admissible under MRE 701 to help the jury understand the evidence and did not invade the province of the jury. *People v. Fomby*, 300 Mich. App. 46, 53 (2013).
>
> Second, it was not inappropriate for Nichols to point out or identify defendant on the recordings. As the manager at defendant's apartment building, Nichols recognized defendant in the video when she first viewed it after the offense. Because she was personally familiar with defendant, her identification testimony did not invade the province of the jury, especially given the lack of clarity in the surveillance video at certain points due to the lighting.

*Humphries*, 2015 WL 5442815, at *14.

This decision did not contravene clearly established Supreme Court law. As was the case with Petitioner's first claim, there is no Supreme Court case establishing a due-process right with regard to lay opinion evidence given by witnesses with first-knowledge of the facts upon which

their opinions were based. *Collier*, 419 F. App'x at 558. Both witnesses were personally familiar with the layout of the apartment building, and the apartment manager was personally familiar with Petitioner's appearance from interactions with her as a resident. The claim is therefore without merit.

E. Effective Assistance of Counsel

Petitioner next claims that his trial counsel was ineffective. He asserts that his attorney failed to raise the objections regarding the surveillance video and opinion testimony discussed above. She also asserts that her counsel should have objected to the admission of testimony by a police officer regarding statements made by the victim at the scene regarding his encounter with Petitioner immediately before the crime. The Michigan Court of Appeals rejected the claim on the merits:

> Defendant argues that trial counsel was ineffective for not objecting to Nichols's and Thomas's testimony regarding the building and Nichols's identification testimony. Because we conclude that this testimony was not improper, defense counsel was not ineffective for failing to object. Counsel is not required to make a futile objection. *People v. Darden*, 230 Mich. App. 597, 605 (1998). Moreover, even if defense counsel arguably should have objected to Thomas's testimony identifying defendant as one of the individuals pictured in the video, defendant has failed to show that he was prejudiced by this purported error for the reasons stated above. *Gaines*, 306 Mich. App. at 300. Therefore, defense counsel was not ineffective when she failed to object to the lay opinion and narrative testimony.
>
> Defendant also asserts that defense counsel was ineffective for failing to object to Lewis's testimony describing what Jones told him about his encounter with defendant shortly before he was robbed. Defendant argues that the testimony constituted inadmissible hearsay. "'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "[A] statement offered to show why police officers acted as they did is not hearsay." *People v. Chambers*, 277 Mich. App. 1, 11 (2007), citing *People v. Jackson*, 113 Mich. App. 620, 624 (1982). It is apparent from the context of the challenged testimony that it was offered to explain why the police wanted to speak to defendant, not for its truth. Under these circumstances, defense counsel's failure to object was not objectively

16

unreasonable. Any objection would have been futile. *Darden*, 230 Mich. App. 605.

*Humphries*, 2015 WL 5442815, at *15.

A petitioner claiming ineffective assistance of counsel must show that counsel's performance was deficient, and that the petitioner was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This "is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). On habeas review, "so long as fairminded jurists could disagree on the correctness of [the state court's] decision" the claim must be denied. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks and citation omitted).

Regarding counsel's alleged failure to object to the issues regarding the surveillance video, the Court has already determined that those claims are without merit. Counsel is not ineffective for failing to raise meritless claims. *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

Petitioner's claim regarding the admission of the victim's statement to the officer is also without merit. The statement was admissible because it was not offered for the truth of the matter asserted, but to explain why the officer took subsequent investigative actions. See, e.g., *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990). Nor did admission of the victim's out of court statement implicate Petitioner's rights under the Confrontation Clause because the victim testified at trial and was subject to cross-examination. See *California v. Green*, 399 U.S. 149, 164 (1970).

The Michigan Court of Appeals reasonably rejected this claim.

D. Jurisdiction of Trial Court

Finally, Petitioner challenges the jurisdiction of the state court to try him due to alleged technical defects in the charging documents. The "[d]etermination of whether a state court is vested with jurisdiction under state law is a function of the state courts, not the federal judiciary." *Wills v. Egeler*, 532 F.2d 1058, 1059 (6th Cir. 1976). A "state court's interpretation of state jurisdictional

issues conclusively establishes jurisdiction for purposes of federal habeas review." *Strunk v. Martin*, 27 F. App'x 473, 475 (6th Cir. 2001). Therefore, any state-law procedural defect in the charging documents that allegedly affected the jurisdiction of the state court to try him does not implicate Petitioner's federal constitutional rights.

As none of Petitioner's claims merit relief, the petition will be denied.

## IV. Certificate of Appealability

Before Petitioner may appeal this decision, the Court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); Fed. R.App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The Court finds that reasonable jurists would not debate the resolution of Petitioner's claims because they are devoid of merit. The Court will therefore deny a certificate of appealability.

If Petitioner chooses to appeal the Court's decision, however, she may proceed in forma pauperis because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, 2) **DENIES** a certificate of appealability, and 3) **GRANTS** permission to appeal in forma pauperis.

**SO ORDERED.**

s/ Nancy G. Edmunds
                                             Hon. Nancy G. Edmunds
                                             United States District Judge

Dated: August 21, 2019